## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNYSLVANIA

———————————————————

| | | |
|---|---|---|
| Nestor Morales-Ramirez, Carlos Suarez-Blandon, Feliciano Ruiz-Valencia, Miguel Ruiz-Valencia, Ignacio Gonzalez-Soto, Milton Oliva-Bolvito, Gerson Gonzalez-Yuman, Jose Victor Carranza-Juarez, Mario Rosa-Borjas, Walter Gomez-Rosa, Aquiles Valdivia-Salinas, Pedro Lorente-Rivera, Juan Escoto-Rayo, Julio Escoto-Rayo, Juan Jose Vega-Hinojosa, Ismael Sanchez-Arreguin, Javier Gonzalez-Soto, Oscar Gonzalez-Soto, Ruben Gonzalez-Soto, Alfredo Ignacio-Soto, Antonio Rivera-Martinez, Efren Nava-Muñoz, Jose Uriel Rodriguez-Aguilar, and Jose Aguilar-Aguilar, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Civil Action No. |
| **Plaintiffs,** | ) ) ) | |
| **v.** | ) ) | |
| International Personnel Resources, Inc. and the Estate of Michael Glah, | ) ) ) | |
| **Defendants.** | ) ) | |

———————————————————

## PLAINTIFFS' ORIGINAL COMPLAINT

## PRELIMINARY STATEMENT

1.      This action is brought by 24 individuals (the "Workers") from Guatemala, Nicaragua or Mexico who initially were recruited for employment in Pennsylvania or New Jersey through the H-2B temporary worker program in the spring, summer, and fall of 2008.

2.      International Personnel Resources, Inc. ("IPR") and its President, Michael Glah, obtained H-2B visas for the Workers, allowing them to work in various temporary, unskilled jobs in Pennsylvania and New Jersey.

3.      IPR and Michael Glah told the Workers that, to obtain another H-2B visa to work for their Pennsylvania and New Jersey employers in the spring of 2009, the Workers had to perform forestry work for a different company in the Southeastern United States in the winter of 2008 and early 2009 on an H-2B visa "extension."

4.      IPR, Michael Glah, and the forestry company lured the Workers to Mississippi with promises of certain hourly wages and other terms of employment.  IPR and Michael Glah also promised the Workers that IPR and the forestry company would ensure the Workers' continued legal status by obtaining both a winter H-2B "extension" for the forestry work and a subsequent H-2B 2009 "extension" to return to work in the Pennsylvania or New Jersey.

5.      Once the workers arrived in Mississippi, however, IPR, Michael Glah, and the forestry company broke those promises.  Among other things, the forestry company refused to pay the workers an hourly wage, relying instead on a piece rate payment system that resulted in the Workers earning less than the wage they had been promised and often even less than minimum wage for long hours of backbreaking work.

6.      IPR, Michael Glah, and the forestry company also repeatedly misled the Workers about the status of their visa extensions, threatened them with serious immigration or legal consequences if they were to leave the work, and preyed upon the Workers' fear, poverty, and isolation to force them to stay and work, regardless of the circumstances of the employment.

7.      After exploiting the workers for several months, IPR, Michael Glah and the forestry company delivered the final blow, informing the Workers that they had not secured the Workers' H-2B visa extensions, thus jeopardizing the Workers' ability to obtain lawful employment in the United States in the future and destroying the Workers' primary source of livelihood.

8.      This action is based on violations of the Workers' rights under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1872 (hereinafter "AWPA"); the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1589-1595 ("TVPA"); and for negligent and fraudulent misrepresentations.

9.      The Workers seek money damages and equitable relief to redress these violations of law.

## JURISDICTION

10.     This Court has jurisdiction over the Workers' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337 (actions arising under Acts of Congress regulating commerce).

11.     The federal claims in this action are authorized and instituted pursuant to 29 U.S.C. § 1854(a) and 18 U.S.C. § 1595(a).

12.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     This Court has personal jurisdiction over IPR and the Estate of Michael Glah, and venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 29 U.S.C. § 1854(a).

14.     The Court has supplemental jurisdiction over the Workers' causes of action based on state law because these claims are so related to the federal claims that they form part of the same case or controversy.  *See* 28 U.S.C. § 1367.

## PARTIES

15.     Each of the Workers is a natural person who was lawfully admitted to the United States on a temporary work visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b) (i.e., an "H-2B visa") during 2008.

16.     At all times relevant to this action, the Workers were "migrant agricultural workers" within the meaning of 29 U.S.C. § 1802(8)(A).

17.     International Personnel Resources, Inc. is a corporation and employment recruiting agency organized under the laws of Pennsylvania with its principal place of business located in West Chester, Pennsylvania.

18.     Michael Glah was an individual who resided in Chester County, Pennsylvania.

19.     Michael Glah was the principal owner and President of International Personnel Resources, Inc.

20.     On information and belief, Michael Glah died on August 2, 2010.

21.     Defendant the Estate of Michael Glah is liable to the full extent allowable by law for the actions and omissions of Michael Glah before his death.

22.     At all times relevant to this action, IPR and Michael Glah were "farm labor contractors" within the meaning of 29 U.S.C. § 1802(6).

## STATEMENT OF FACTS

23.     The Workers are indigent and speak and read primarily Spanish.  One worker, Gerson Gonzalez Yuman, is deaf; he reads lips and uses sign language.

24.     All of the actions and omissions alleged herein were undertaken by IPR and Michael Glah either directly, or through their agents.

25.     In 2007, various Pennsylvania and New Jersey employers contracted IPR to bring the Workers to the United States on H-2B visas during 2008.  IPR obtained H-2B visas for the Workers, authorizing them for employment with these companies.  Depending on the terms of their respective visas, the Workers arrived in the United States between March and October of 2008; their H-2B

visas authorized them to remain in the country until November or December 2008, again depending on the time period specified by each individual worker's visa.

26.     In 2008, the Workers took out loans in their home countries to cover travel and other costs related to coming to the United States on an H-2B visa.

27.     H-2B workers are ordinarily required to return to their home countries within 10 days of the expiration of their work visas. Many of the Workers had entered previously on H-2B visas and were accustomed to returning to their home countries immediately after their visa term expired and then coming back to the work in the United States on another H-2B visa the next year.

28.     In 2008, however, IPR and Michael Glah told the Workers that they had to remain in the United States during the winter and work for a forestry company in the "South." IPR, Michael Glah, and the forestry company repeatedly assured the Workers that IPR and the forestry company would apply for and obtain an H-2B visa "extension" or transfer legally authorizing the Workers to perform this forestry work. IPR and Michael Glah also told the Workers that IPR would then obtain for the Workers a subsequent H-2B "extension" allowing them to return to work for their respective employers in Pennsylvania and New Jersey in 2009.

29.     IPR and Michael Glah told the Workers that working in the South was the only way that they could get H-2B "extensions" to return to work with their employers in the Northeast the next year.

30.     IPR also informed some of the Workers that, through this H-2B visa "extension" process, the Workers would lawfully be able to remain in the United States for three years.

31.     In the fall of 2008, the Workers each paid IPR approximately $650 to cover the costs of the 2009 H-2B visa "extensions," which would supposedly allow them to return to work for their

employers in the Northeast.  The $650 was deducted in installments from the Workers' paychecks at their H-2B jobs in Pennsylvania and New Jersey.

32.     On information and belief, the forestry company also paid IPR to recruit the Workers.

33.     In late 2008, IPR, Michael Glah, and the forestry company began recruiting the Workers for forestry work.

34.     At the time that IPR, Michael Glah, and the forestry company recruited the Workers, IPR, Michael Glah, and the forestry company failed to disclose adequately and accurately in writing all terms and conditions of employment as required by the AWPA.  *See* 29 U.S.C. § 1821.

35.     In or around October 2008, IPR, Michael Glah, and the forestry company informed some of the Workers of the terms and conditions of the job with the forestry company at a meeting in West Chester, Pennsylvania.

36.     On information and belief, neither Michael Glah nor any other employee or agent of IPR applied for a certificate of registration as a Pennsylvania farm labor contractor from the Pennsylvania Secretary of Labor, as required Pennsylvania Seasonal Farm Labor Act, 43 P.S. § 1301 *et seq*. ("PA SFLA"), either prior or subsequent to the West Chester meeting.

37.     At the meeting in West Chester, IPR, Michael Glah and the forestry company gave some of the Workers copies of documents reflecting certain terms and conditions of the work, including a pay rate of between $8.62 and $12.93 per hour.   The documents did not say anything about the Workers being paid on a piece rate.

38.     IPR, Michael Glah, and the forestry company also recruited some Workers who did not attend the West Chester meeting.

39.     IPR and Michael Glah provided some of the Workers who did not attend the meeting in West Chester with short written statements regarding certain terms and conditions of work,

including the departure date for the job; contact information for the forestry company; and a pay rate of between $8.50 and $12.50 per hour.  These documents did not mention a piece-rate pay scheme and did not state the specific place of employment; the period of employment; or whether worker's compensation or unemployment insurance would be provided.

40.     Some of the Workers never received any written disclosures at all from IPR, Michael Glah, or the forestry company.

41.     IPR and Michael Glah utilized Down to Earth Landscaping in New Jersey to recruit and furnish some of these Workers to the forestry company.

42.     On information and belief, at all times relevant to this action, neither IPR, Michael Glah, or any other officer or employee of IPR had farm labor contractor certificates of registration issued by the U.S. Department of Labor (hereinafter "USDOL") authorizing them to perform farm labor contracting activities such as recruiting or furnishing agricultural workers.  *See* 29 U.S.C. § 1811.

43.     On information and belief, at all times relevant to this action, neither Down to Earth Landscaping nor its officers or employees had farm labor contractor certificates of registration issued by USDOL authorizing them to perform farm labor contracting activities such as recruiting or furnishing agricultural workers.

44.     IPR and Michael Glah failed to take reasonable steps to determine whether Down to Earth Landscaping had a certificate of registration issued by USDOL that authorized the farm labor contractor activities for which Down to Earth Landscaping was utilized by IPR and Michael Glah.

45.     Among other things, the Workers' working arrangement with the forestry company called for the Workers to be away from their permanent places of residence and to travel to Mississippi to work for the forestry company.

46.     The Workers accepted work for the forestry company in reliance on the representations made by IPR, Michael Glah, and the forestry company regarding the terms and conditions of the Workers' employment and their promised H-2B visa "extensions."

47.     On or around December 5, 2008, IPR, Michael Glah, and the forestry company caused the Workers to be transported from Pennsylvania to Mississippi to work.

48.     When the Workers arrived in Mississippi, the forestry company initially housed the Workers in filthy, overcrowded trailers.  The trailers had only two or three bedrooms, and approximately 15-30 Workers were required to stay in each trailer.  There was virtually no furniture, and most workers had to sleep on the floors.  The trailers lacked adequate kitchen facilities, lacked adequate sleeping arrangements, lacked adequate space for the number of workers living there, lacked adequate toilet and shower facilities, and were infested with insects, rodents, and other vermin.  This housing failed to meet the minimum safety and health standards required by the AWPA and under applicable state and federal law.  *See* 29 U.S.C. § 1823.

49.     In 2008 and 2009, the Workers engaged in "agricultural employment" at the forestry operations within the meaning of 29 U.S.C. § 1802(3), which consisted primarily of planting pine saplings.

50.     The Workers planted pine saplings for the forestry company at various work sites in Mississippi, Louisiana, and Arkansas.

51.     The forestry company did not pay the Workers the hourly wage that the Workers had been promised during their recruitment in Pennsylvania and New Jersey.  Instead, the Workers were paid on a piece rate of approximately $35 per 1000 pines planted.

52.     This piece rate was not disclosed to the workers until after they arrived in Mississippi.

53.     The Workers regularly loaded pine saplings onto trailers before traveling substantial distances to the work sites, but were not compensated for any time spent loading the pines or for time spent traveling after loading the pines.

54.      The forestry company made numerous deductions from the Workers' wages without explaining the purpose of each sum withheld on the Workers' pay stubs.  Many of these deductions were unlawful.

55.     The Workers sometimes were unable to cash their checks and were told that this was because the forestry company had insufficient funds in its account.

56.     The forestry company sometimes failed to pay the Workers on the designated pay day.

57.     Due to the forestry company's piece-rate payment scheme, failure to compensate the Workers for all hours worked, and illegal deductions from the Workers' pay, the forestry company did not pay the Workers the federal minimum wage for each and every hour worked by the Workers in each discreet workweek.

58.     Due to the forestry company's piece-rate payment scheme, failure to compensate the Workers for all hours worked, and illegal deductions from the Workers' pay, the forestry company did not pay the Workers the wage promised to them in the working arrangement.

59.     The Workers often worked in excess of 40 hours in a given workweek.  The forestry company did not pay overtime to the Workers for any hours they worked in excess of 40 in a given workweek.

60.     The forestry company did not provide the Workers with itemized pay statements as required by the AWPA, 29 U.S.C. § 1821(d).  The pay stubs that the forestry company provided to the Workers did not include the number of hours worked or an itemized explanation of the deductions being made from their total pay.

61.     Both before and during their employment with the forestry company, the Workers repeatedly asked IPR, Michael Glah, and the forestry company about the status of their H-2B visa "extensions" and requested their "extension" documents from IPR, Michael Glah, and the forestry company.

62.     IPR, Michael Glah, and the forestry company repeatedly reassured the Workers that the H-2B visa extension applications had been submitted and that the H-2B visa extension documents would arrive soon. IPR, Michael Glah, and the forestry company knew that these representations were false or were reckless about or ignorant of the truth of these representations because neither IPR, Michael Glah, or the forestry company had applied for the Workers' visa extensions.

63.     In the alternative, IPR and Michael Glah failed to exercise the proper diligence to determine the status of the visa applications prior to making representations to the workers regarding their visa extensions or ought to have known the representations were false.

64.     FOIA requests to the United States Department of Labor and the United States Customs and Immigration Services have revealed that no H-2B extension applications were filed on behalf of the Workers and that the forestry company did not have the certification from the United States Department of Labor required to obtain temporary work visas.

65.     At a meeting in New Jersey in April 2009, many of the Workers were informed by an attorney for Down to Earth Landscaping that no winter H-2B visa extension applications had been submitted on the Workers' behalf.

66.     The Workers at all times complied with the terms of the working arrangements.

67.     IPR, Michael Glah, and the forestry company violated without justification the working arrangements with the Workers by not complying with all the terms and conditions of

employment, including by failing to pay the promised wage rate and failing to apply for and secure H-2B visa extensions or transfers.

68.    IPR, Michael Glah, and the forestry company repeatedly misrepresented the status of the Workers' visa applications as part of a scheme to ensure that the Workers would continue to labor for the forestry company.

69.    IPR, Michael Glah, and the forestry company caused the Workers to believe that they could not leave their employment with the forestry company, threatening the Workers that if they did not work for the forestry company they would lose their winter extensions and their spring 2009 H-2B extensions to work in New Jersey and Pennsylvania, which constituted the Workers' primary means of livelihood.

70.    Furthermore, when the Workers inquired about the extensions or complained to a manager of the forestry company about the company's failure to fulfill the promises it made to them in New Jersey and Pennsylvania, the manager told the workers that he would contact immigration enforcement authorities if the Workers attempted to leave, would cancel their extensions or have them deported, and insisted that immigration enforcement authorities would catch the Workers and deport them if they left without the extension documents.

71.    Some of the Workers suspected that the forestry company had received the visa extension documents but was refusing to give the documents to the Workers to ensure that the Workers did not try to leave.

72.    The Workers reasonably relied on the representations of IPR, Michael Glah, and the forestry company that the Workers would soon receive their winter visa extensions and, under the circumstances, the Workers felt compelled to continue working for the forestry company while waiting for the extension documents.

73.     As a result of this scheme, the forestry company was able to maintain a steady labor force of Workers who could not leave despite terrible working conditions.  The Workers' continued employment with the forestry company also allowed IPR to charge the Workers (and, on information and belief, their employers in New Jersey and Pennsylvania) visa processing fees for the 2009 H-2B extensions that it had promised.

74.     Given the overall coercive nature of the employment, the specific threats that the Workers would lose any chance of a future H-2B visa and thus their primary means of livelihood if they were to leave their jobs with the forestry company, the threats to report the Workers to federal immigration officials if the Workers left their jobs, and the Workers' reasonable fear of adverse immigration and employment consequences were they to leave (including the possibility of being deported or prohibited from ever returning to the United States), the Workers were afraid to leave employment with the forestry company without their visa extensions.

75.     The Workers never received H-2B visa extensions for the forestry work nor did they receive H-2B visa extensions allowing them to return to work with their employers in the Northeast in 2009 as the Workers had been promised.

### FIRST CAUSE OF ACTION:  MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT

76.     IPR and Michael Glah intentionally violated the Workers' rights under the AWPA by:

a.      Engaging in farm labor contracting activity, particularly recruitment and furnishing of workers, without a certificate of registration from the Secretary of USDOL, 29 U.S.C. § 1811(a);

b.      Failing to provide required written disclosures at the time of the Workers' recruitment, 29 U.S.C. § 1821(a);

c.    Violating the terms of the working arrangement without justification, 29 U.S.C. § 1822(c);

d.    Using a farm labor contractor without taking reasonable steps to determine that the farm labor contractor possessed a certificate of registration authorizing the activity for which the contractor was utilized, 29 U.S.C. § 1842.

77.    For each such violation of the AWPA, the Workers are entitled to recover their actual damages or up to $500 in statutory damages, 29 U.S.C. § 1854.

## SECOND CAUSE OF ACTION: TRAFFICKING VICTIMS PROTECTION ACT—TRAFFICKING

78.    This Count sets forth a claim for compensatory and punitive damages for the violations by IPR and Michael Glah of the TVPA, 18 U.S.C. § 1590.

79.    18 U.S.C. § 1590 provides that "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter," including the laws prohibiting forced labor, has engaged in unlawful behavior under the TVPA.

80.    18 U.S.C. § 1589(a) provides that it is unlawful to "knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

81.     18 U.S.C. § 1589 (b) makes it unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

82.     In 2008 and 2009, IPR and Michael Glah violated 18 U.S.C. § 1590 by recruiting, transporting, and obtaining the Workers' labor in violation of 18 U.S.C. § 1589's prohibition against forced labor, and by knowingly benefiting from forced labor.

83.     Pursuant to 18 U.S.C. § 1595, the Workers are entitled to recover damages, reasonable attorney's fees, and costs for IPR and Michael Glah's wrongful conduct.

### THIRD CAUSE OF ACTION: TRAFFICKING VICTIMS PROTECTION ACT — FORCED LABOR

84.     This Count sets forth a claim for compensatory and punitive damages for the violations by IPR and Michael Glah of the TVPA, 18 U.S.C. § 1589.

85.     18 U.S.C. § 1589(a) prohibits knowingly providing or obtaining "the labor or services of a person by any one of, or by any combination of, the following means—(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

86.     18 U.S.C. § 1589(b) makes it unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or

obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

87.     In 2008 and 2009, IPR and Michael Glah knowingly provided the labor or services of the Workers to the forestry company by means of threats of serious harm, the abuse or threatened abuse of law or the legal process, and a scheme or plan intended to cause the Workers to believe that, if they did not labor for the forestry company, they would suffer serious harm.

88.     In 2008 and 2009, IPR and Michael Glah knowingly benefited financially and otherwise from participation in a venture with the forestry company that employed the Workers knowingly or in reckless disregard of the fact that the forestry company had obtained the labor of the Workers in violation of 18 U.S.C. 1589(a).

89.     Pursuant to 18 U.S.C. § 1595, the Workers are entitled to recover damages, reasonable attorney's fees, and costs for IPR and Michael Glah's wrongful conduct.

### FOURTH CAUSE OF ACTION:  FRAUDULENT OR INTENTIONAL MISREPRESENTATION

90.     IPR and Michael Glah made false, material statements to the Workers regarding their visa extensions.  Specifically, IPR and Michael Glah informed the Workers that their H-2B visa "extension" applications had been filed and were being processed and that the Workers would shortly receive confirmation of those visa "extensions," despite the fact that neither IPR nor the forestry company ever applied for the Workers' H-2B winter visa "extensions."

91.     IPR and Michael Glah knew these statements were false, were ignorant of their truth, or were reckless as to the truth of those statements.

92.     IPR and Michael Glah intended to mislead the Workers into relying and acting on their statements regarding the visa extensions in the manner reasonably contemplated.  Namely, IPR and Michael Glah intended that the Workers continue to labor for the forestry company while awaiting the arrival of the "extension" documents.

93.     The Workers were ignorant of the falsity of these statements and rightfully and justifiably relied on the alleged truth of the statements.

94.     The Workers suffered consequential and proximate injury from these statements.

## FIFTH CAUSE OF ACTION:  NEGLIGENT MISREPRESENTATION

95.     IPR and Michael Glah misrepresented and/or omitted material and significant facts to the Workers regarding their winter visa "extensions."

96.     IPR and Michael Glah failed to exercise the degree of diligence and expertise the public is entitled to expect of such persons, and/or they ought to have known of the falsity of their statements.

97.     The Workers justifiably and reasonably relied upon IPR and Michael Glah's misrepresentations and/or omissions regarding the extension documents, and IPR and Michael Glah intended to induce the Workers to act upon those misrepresentations and/or omissions.  Namely, the Workers reasonably believed that IPR, Michael Glah, and the forestry company had, in fact, applied for the visa "extensions" and that the documents would be forthcoming, and thus the Workers continued to work for the forestry company in anticipation of receiving those extensions, as IPR and Michael Glah intended to induce the Workers to do.

98.     The Workers suffered damages as a direct and proximate result of such reasonable reliance.

## PRAYER FOR RELIEF

WHEREFORE, the Workers request that the Court grant them the following relief:

a.   Enter a judgment in favor of the Workers on their AWPA claims as set forth in their First Cause of Action;

b.   Award the Workers their actual damages or, alternatively, statutory damages of $500 per person per violation for Defendants' violations of the AWPA;

c.   Enter judgment in favor of the Workers on their TVPA claims as set forth in the Second and Third Causes of Action;

d.   Award the Workers declaratory, compensatory, and punitive damages for Defendants' violations of the TVPA;

e.   Award the Workers compensatory damages for Defendants' fraudulent, intentional, or negligent misrepresentations;

f.   Award the Workers punitive damages for Defendants' fraudulent or intentional misrepresentations;

g.   Award the Workers prejudgment and post-judgment interest as allowed by law;

h.   Award the Workers their attorneys' fees, reasonable expenses, and costs of court; and

i.   Award the Workers such other relief as this Court deems just and proper.

Dated: December 2, 2010

Respectfully submitted,

_____

Arthur N. Read
     Attorney Registration No. 29360
Teresa Rodriguez
     Attorney Registration No. 93912
Matthew Stark Rubin
     Attorney Registration No. 209423
Friends of Farmworkers, Inc.
42 S 15th St, Suite 605
Philadelphia, PA 19102-2205
Telephone: (215) 733-0878
Fax: (215) 733-0876
     Attorneys for Plaintiffs


Edward Tuddenham
1339 Kalmia Rd. NW
Washington, DC 20012
Telephone: (202) 249-9499
Fax: (512) 532-7780
     Attorney for Plaintiffs


Stacie Jonas
Southern Migrant Legal Services, a Project of Texas
     Riogrande Legal Aid, Inc.
311 Plus Park Blvd., Ste. 135
Nashville, Tennessee 37217
Telephone: (615) 750-1200
Facsimile: (615) 366-3349
     Attorney for Plaintiffs Milton Oliva-Bolvito, Gerson Gonzalez-Yuman, Jose Victor Carranza-Juarez, Mario Rosa-Borjas, Walter Gomez-Rosa, Aquiles Valdivia-Salinas, Pedro Lorente-Rivera, Juan Escoto-Rayo, Julio Escoto-Rayo, Juan Jose Vega-Hinojosa, Ismael Sanchez-Arreguin, Javier Gonzalez-Soto, Oscar Gonzalez-Soto, Ruben Gonzalez-Soto, Alfredo Ignacio-Soto, Antonio Rivera-Martinez, Efren Nava-Muñoz, Jose Uriel Rodriguez-Aguilar, Walter Gomez-Rosa, and Jose Aguilar-Aguilar